THE LOUISVILLE COAL & COKE COMPANY V. THE POCAHON-
TAS COMPANY; AND THE GREENBRIER COAL & COKE
COMPANY V. THE POCAHONTAS COMPANY.

1. A partnership selling the product of a coal company under a
contract designating the partnership as "selling agents," where
the ultimate selling price is fixed by the company and the
compensatioin for sellng is a "commission" by way of a per-
centage on sales, the fact that the partnership guarrantees the
sales, insures and pays other expenses incidental to selling, does
not place them in the relation of purchasers but of factors under
a *del credere* commission as agents.

2. Property of a non-resident, held in this state by a *del credere*
factor, may be attached as the property of the non-resident,
subject to the factor's lien for commissions, advances, etc.

HOSEA, J.; FERRIS, J., and HOFFHEIMER, J., concur.

By the act of 52 O. L., 34, this court is given jurisdiction
of actions brought against a non-resident of this state or a
foreign corporation where property of or debts owing to
the defendant may be found in the city of Cincinnati.

These suits are brought against a foreign corporation,
and the primary question involved in these motions arises
upon the validity and effect of a garnishment served upon a
partnership composed of non-resident partners doing busi-
ness within the jurisdiction of the court, in suits for money.

It may be premised as a cardinal principle that the juris-
diction of the court in a suit against a non-resident depends
upon and is limited in extent to property taken into custody
upon attachment proceedings duly had. The suits therefore
become, essentially, proceedings *in rem* (*Buckeye Pipe Line
Co.* v. *Fee,* 62 O. S., 545 [556]; *Oilwell Supply Co.* v. *Koen,*
64 O. S., 422 [429]), and the fact that such property, subject
to garnishment, exists in the hands of the garnishee, must
be found by the court before the suit in attachment can pro-
ceed to final judgment. *Myer* v. *Smith et al,* 29 O. S., 120.

It is a settled principle also that in proceedings depending
not upon natural right, but upon statutory authority solely,
the conditions imposed by the statute as the basis of remedial
action must be complied with. Attachment laws are there-

fore strictly construed as against the party seeking their enforcement. *Cook* v. *Olds Gasoline Works,* 19 C. C., 732; *Endel* v. *Leibrock,* 33 O. S., 254.

In the case at bar the summons issued January 8, 1903, is returned "not found," and an order of attachment January 8, 1905, is returned, endorsed: "1903, January 8. No goods or chattels, lands or tenements found to attach, and I have this day served Castner, Curran & Bullitt with a true copy of this writ and notice to garnishee by leaving the same at the usual place of business of said partnership and with H. R. Mather, manager of said firm, personally, at 11:55 o'clock, and have summoned them to appear and answer as required by law."

The statutory basis for service upon garnishee is an affidavit describing the property coupled with the inability of the officer to get possession of the same. (Section 5530.) If the garnishee be a partnership, service may be made by leaving a copy of the order and notice to the garnishee to appear in court and answer, at the usual place of doing business, etc. (Section 5534.) It is further provided that the garnishee shall stand liable to the plaintiff in attachment for all property of the defendant in his hands and money and credits due from him to the defendant from the time he is served with the written notice mentioned in Section 5530 (Section 5538).

Incidentally it has been held that the service holds only such property as is at the time in the hands of the garnishee. *Rice* v. *Farnham,* 7 N. P., 189.

The question here, then, is a jurisdictional one, namely: Is there property or are there credits lawfully in the custody of the court by virtue of the proceedings had in this case?

·  So far as concerns the objection that a garnishment proceeding will not lie against the property or credits of a non-resident debtor, as intimated in a dictum in *Root* v. *Davis,* 51 O. S., 29, it seems to be conclusively answered to the contrary by Judge Sayler in a case decided by him when on the bench of the common pleas. See *Goebel* v. *Bank,* 3 N. P., 109.

The garnishee has filed no answer, but under the order of the court, H. R. Mather, the local agent of the garnisheed firm, appeared before a referee and admitted the service of garnishee process and claimed ignorance of any relation of indebtedness of the firm represented by him, and that no account with the Pocahontas Company existed on his books; that his custom was to deposit all collections from sales in bank here to the credit of Castner, Curran & Bullitt, Philadelphia, excepting a small amount reserved as an agency fund.

Upon a subsequent examination he could not answer as to amount of coal on hand on January 8, 1904, as his books had all been sent to the head office in Pennsylvania since his first examination, and he refused to request their return. Upon the order of the referee, however, he subsequently testified that he had done so, but the firm declined to send the books or give any information.

In support of the motion to dismiss the attachment, the defendant files affidavits of Tierney, president, and Goodwill, secretary, of the Pocahontas Company; and of Castner, of the garnisheed firm, claiming in substance that the parties are all non-residents of Ohio; that Castner, Carran & Bullitt owe nothing to the Pocahontas Company; that the Pocahontas Company has no property in Ohio; that the Castner, Curran & Bullitt firm was not formed to do business in Ohio, and never had any property of the Pocahontas Company in its possession in Ohio, and has no contract with the Pocahontas Company made or to be performed in Ohio.

Against the motion the plaintiff presents, in addition to the testimony of Mather before the referee, affidavits of Justus Collins, president; Javius Collins, secretary and treasurer, and J. S. Jameson—all of plaintiff company—and H. W. O'Keefe, agent at Bluefield, West Virginia, of the Smokeless Fuel Company, all of whom say that the Pocahontas Company buy the output of the collieries mining Pocahontas coal and employs Castner, Curran & Bullitt as its excusive selling agent. They detail the method of business by which the agents sell and distribute the coal to purchasers through the various branches of the firm in the

United States and elsewhere; and aver that the firm sells an average of about ten thousand tons per month in and near Cincinnati; and attach schedules showing the exact quantities shipped to Castner, Curran & Bullitt, at Cincinnati, from December 1, 1903, to January 8, 1904. They assert, on the basis of these figures, that Castner, Curran & Bullitt were indebted on January 8, 1904, for coal shipped and not yet paid for, about forty thousand dollars.

By way of rebuttal, affidavits of Tierney and Mather are presented. The former, having read the preceding affidavits, denies that the coal of the Pocahontas Company was sold by Castner, Curran & Bullitt, and declares that it became the property of Castner, Curran & Bullitt when loaded at the mine tipples, and denies that the Pocahontas Company ever shipped any coal to Castner, Curran & Bullitt at Cincinnati or to its customers. He attaches a copy of the contract between the Pocahontas Company and Castner, Curran & Bullitt governing their relations, claiming that it was made and its provisions carried out in West Virginia. He details the operations and procedure under the contract, claiming that Castner, Curran & Bullitt are purchasers of the coal in West Virginia, and that it then and there becomes their property at an agreed price "subject to readjustment" according to the ultimate selling price, and that Castner, Curran & Bullitt "assume all risk and pay all incidental charges," "but the Pocahontas Company holds Castner, Curran & Bullitt immediately responsible for the price of its product agreed upon as aforesaid." He says that settlements are made each month with Castner, Curran & Bullitt of Philadelphia, and that the Pocahontas Company have no dealings with local agents of Castner, Curran & Bullitt.

Mather avers that he keeps no accounts with the Pocahontas Company, and claims that Castner, Curran & Bullitt are sole owners of the coal; that they insure it as their own in their bins and pay taxes on it. He attaches copies of the tax returns made by him as the local agent of Castner, Curran & Bullitt from 1898 to 1904, inclusive, showing an average return of about twelve thousand dollars in value of coal on hand.

It will be manifest from this testimony that the effort of defendants is directed to asserting in various forms that the legal relations of the firm of Castner, Curran & Bullitt to the Pocahontas Company are those of purchaser towards the seller and not those of agency, as originally claimed by Mather. It is true that where the terms of a contract between parties are obscure or uncertain, the practical construction which the parties themselves have put upon it will have great weight with a court in determining its meaning and legal effect; but where the parties have put their contract in writing, resort must be had in the first instance to the writing, as if its terms are clear and there is nothing uncertain as to its meaning, there is no occasion to resort to extraneous aïds to its interpretation. This is the more necessary because acts are often equivocal and may be equally consistent with one or the other of the two theories of relationship of parties—and this is true of much of the testimony here.

In the present case, however, the contract itself refers throughout to "agents" and "sales agents"; and while this fact of itself is not conclusive, the context adds to its significance, as will appear from the following extracts, in which we italicize certain words and phrases:

(1) The party of the first part agrees to constitute and appoint the parties of the second part its *sole agents* during each and every year of the life of this agreement *to sell coal for the party of the first part. The prices and terms of sale shall be determined from time to time by the party of the first part,* etc.

(2) The party of the first part agrees to pay to the parties of the second part and the parties of the second part agree to accept *as their commission on sales of coal made by them as such agents* the following amounts (percentages of net selling price f. o. b. Norfolk, etc). * * * *Parties of second part agree to accept said commission upon the condition that they shall be employed as the sole and exclusive sales agents,* etc. * * *

(3) and (4) (More references to *"selling agents"* and provisions for liquidation of damages in case of breaches.)

(5)   Castner, Curran & Bullitt guarantee to take charge of inspections, shipments and delivery, collections of bills, and pay charges, and to pay on the 14th of each month proceeds of all coal passing weigh scales of N. & W. R. R. during preceding calendar month, etc..

(6)   *To keep accurate books of account of all transactions as such agents.* * * * *open to inspection of Pocahontas Company, and render account of sales each month, and prices obtained.*

In a word, the entire purpose and effect of the contract in question was to constitute the firm of Castner, Curran & Bullitt selling agents of the Pocahontas Coal Company. The plain import of the language employed is to create the relation of factor, under a *del credere* commission—an agency pure and simple, with clearly defined limitations of power and equally clear obligations of accountability.   Castner, Curran & Bullitt are (1) to sell for the Pocahontas Company; (2) to collect and guarantee payments; (3) to render an account of sales and remit proceeds; (4) to make advances on shipments; (5) cover expenses of selling; (6) to sell at prices fixed by Pocahontas Company; (7) and to receive as compensation a percentage on sales—all these are consistent only with the relation of *agents,* and are entirely inconsistent with the relations of *purchasers,*

The case is in some respects similar to that of *Wilcox & Gibbs Co.* v. *Ewing,* 141 U. S., 627, where the contract gave Ewing exclusive rights of sale in certain territory at prices fixed by plaintiff; required him to purchase twenty thousand dollars' worth of machines during the year 1875, and to maintain regular retail rates, and defendant bought of the company the agency property and leased from them the building required to do business.   The court (Justice Harlan) held that the contract was one of agency and terminable at the will of the principal, subject to existing contracts made by agents.

The case of *Ex parte White in re Neville,* L. R., 6 Ch., 397, relied upon by the movers, has no application.   The controlling feature in that case was the fact that the purchasing party was accountable only for a fixed purchase price and

was entirely untrammeled as to his selling price—his compensation being a profit and not a commission.

Tested by well-established principles, the contract in the present case provides for nothing more than incidents of a *del credere* agency. A factor under a contract guaranteeing the price of goods sold is none the less an agent occupying a fiduciary relation to his principal. *Baring* v. *Corrie,* 2 B. & Ald., 127; *Ex. p. White, in re Neville,* L. R., 6 Ch. App., 397. Other matters shown in the affidavits and relied upon as proving a relationship of purchaser rather than agency, are within the usual incidents of a *del credere* agency. A factor under such a commission may not only sell in his own name, but, for many purposes as to third parties be regarded as the owner. He has, in fact, a special property in the goods by virtue of his lien for advances and commissions. 63 N. W. Rep., 720; 23 Wall., 55. While he may insure in his own name (120 Mass., 449), sell in his own name, and even sue in his own name for the selling price, nevertheless the title to the goods remains in the consignor until sold. 38 W. Va., 158. See, generally, *Wittowski* v. *Harris,* 64 Fed., 712; *Morris* v. *Clusby,* 4 M. & S., 566 (574); *Grove* v. *Dubois,* 1 T. R., 112; *Gould* v. *Lee,* 55 Pa. St., 99; *Cushman* v. *Snow,* 186 Mass., 169.

The relation of the firm of Castner, Curran & Bullitt to the Pocahontas Company being that of agency. the coal on hand on January 8, 1903, in the yards of Castner, Curran & Bullitt was the property of the Pocahontas Company, subject to whatever lien existed in favor of Castner, Curran & Bullitt for their advances and unpaid commissions. For like reasons the firm of Castner, Curran & Bullitt were not debtors of the Pocahontas Company in respect of moneys due, in the ordinary sense, because their relation as factors was a fiduciary one.

No reason appears, therefore, why the officer holding the writ of attachment could not have levied the same upon the coal in the yards, because it is admitted that coal was there in large quantities in possession of Castner, Curran & Bullitt under its contract relations with the Pocahontas Com-

pany—which we find to have been the property of the Poca-hontas Company. *Davis* v. *Lewis*, 16 C. C., 138.'

Under these circumstances, it is manifest that the plain-tiff in attachment has failed by the proceedings thus far taken to secure a proper anchorage for the jurisdictional power of the court, which, in these cases, as already shown, depends upon an actual bringing of tangible property *in custodia legis* through strict observance of the means pointed out by statute.

The motion will be granted and the attachments dismissed, but without prejudice.

*Drausin Wulsin* and *F. O. Suire,* for plaintiffs.
*W. C. Herron,* for defendant.